UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JAMIE W. SIMPSON,

        **Plaintiff,**

    -vs-                                           Case No. 2:05-cv-334-FtM-29DNF

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This matter is before the Court on the Plaintiff's complaint (Doc. 1), seeking review of the final decision of the Commissioner of Social Security of the Social Security Administration (the "Commissioner") denying hIS claim for a period of disability and disability insurance benefits ("DIB") pursuant to 42 U.S.C. § 405(g).

      The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memorandums. For the reasons set forth below, the Court recommends that the Commissioner's decision be **AFFIRMED**.

_____

1

### I. Social Security Act Eligibility,
### the ALJ Decision, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his/her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511. The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On March 13, 2002, the Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Benefits, with a protective filing date of February 13, 2002. (Tr. 44, 82; 79-81). This claim was denied initially and upon reconsideration wherein the Plaintiff filed a request for hearing. The hearing was held before Administrative Law Judge (ALJ) E. Patrick Golden on December 15, 2003. (Tr. 331-350). ALJ Golden denied benefits on February 23, 2004. (Tr. 41-51). The Plaintiff filed a Request for Review of the hearing decision which was granted by the Appeals Council and on July 14, 2004, this case was remanded to the ALJ. A second hearing was held before ALJ Golden on September 9, 2004. On February 11, 2005, ALJ Golden issued a new decision denying the Plaintiff's applications. (Tr. 18-28). The Appeals Council denied Plaintiff's Request for Review. (Tr. 6-8) The Plaintiff has exhausted his

administrative remedies and has filed a timely action in this Court. This case is ripe for review under sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3).

At Step 1, the ALJ found the Plaintiff had met the non disability requirement for a period of Disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is fully insured for benefits through June 2006. The Plaintiff alleges being disabled as of January 18, 2001. [Tr. 18]. Step 2, the ALJ concluded that the Plaintiff's impairments of depression, urinary retention, multiple sclerosis, obesity, irritable bowel syndrome and degenerative changes of the spine are "severe" impairments, based upon the requirements in the Regulations. (20 C.F.R. §§ 404.1520(b) and 416.920(b)). [Tr. 27]. At Step 3, the ALJ found these impairments did not meet or equal, either singly or in combination, with any other impairments in Appendix 1, Subpart P, Regulations No. 4. [Tr. 28]. The ALJ also determined that the Plaintiff's allegations regarding his limitations were not fully credible as the Plaintiff had received unemployment benefits until October 2001[1] [Tr. 28]. Further, the Plaintiff is considered a "younger individual 18 to 44"[2]. (20 C.F.R. §§ 404.1563 and 416.965). [Tr. 28]. At Step 4 the ALJ determined the Plaintiff was unable to perform his past relevant work as a roofer and

---

[1] To obtain unemployment benefits, an individual holds himself out as employable and must actively seek work. In his application the Plaintiff alleges he was unable to engage in any work since January 2001. This date coincides with the date he was laid off from work.

[2] At the time of the hearing, the Plaintiff was forty (40) years of age.

machine shop worker. [Tr. 91, 96]. At Step 5, with the testimony of a vocational expert and reliance on the Medical Vocational Rule 201.25 as a frame-work for his decision making, the ALJ determined that there are a significant number of jobs in the national economy that the Plaintiff could perform. [Tr. 28]. Dr. Steven Newman, a neurologist, testified regarding the Plaintiff's multiple sclerosis and Vocational Expert, Dr. Michael Rosko, testified that a significant number of jobs existed in the Plaintiff's geographical area which the Plaintiff could perform considering his age, education and residual functional capacity. Accordingly, the ALJ found the Plaintiff was not disabled.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v.. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account

evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II.  REVIEW OF FACTS AND CONCLUSIONS OF LAW

**A.** **Background Facts:**

The Plaintiff was born on November 26, 1964, and was 40 years old at his administrative hearing. [Tr. 79]. The Plaintiff has a 10th grade education and past relevant work experience as a skilled machinist, a CNC operator and a roofer. [Tr. 96, 116, 346]. The Plaintiff alleges an onset date of January 18, 2001, due to multiple sclerosis, back pain, numbness, fatigue, headaches, vision problems, fatigue and major depression. [Tr. 79; 90]. His date last insured is June, 2006. [Tr. 83].

On January 3, 2002, a Physical Capacities Assessment was completed by Dr. Nadia Zaki of the Michigan Rehabilitation Services. Dr. Zaki is the Plaintiff's treating physician and a specialist in neurology. It was indicated that the Plaintiff was limited to lifting less than 25 pounds, that he would sometimes be able to walk up to two hours or maybe occasionally walk up to six hours. The Plaintiff's environmental restrictions due to his disability included avoiding machinery with moving parts, unprotected heights, and marked temperature or humidity changes. [169].

On April 9, 2002, Dr. Zaki, completed a medical report indicating a diagnosis of multiple sclerosis, anxiety/depression and headaches. Dr. Zaki's notes reflect that Plaintiff's onset of symptoms dated back to October 2001 and included "visual disturbance, parasthesia, and bowel/bladder dysfunction. The multiple sclerosis diagnosis was confirmed on the MRI[3] of the brain/cervical spine and lumbar puncture. [Tr. 170]. Further, the doctor reported the Plaintiff had left hemi-paresis and poor balance, and evidence of disorganization of motor function (mild gait ataxia) with significant fatigue both mentally and physically. [Tr. 171].

On May 6, 2002, the Plaintiff was seen by S. Bonnano, M.A., LLP., for a psychiatric evaluation. Dr. Bonnano's general observation included that the Plaintiff walked slowly and often lost his balance. The Plaintiff was diagnosed with depressive disorder, hypertension, irritable bowel syndrome and reflux. The Plaintiff was given a GAF score of 55. [Tr. 207].

On June 19, 2002, the Plaintiff was seen by Sadia Shaikh, M.D.. Dr. Shaikh completed a Physical Residual Functional Capacity Assessment Form finding that the Plaintiff could lift or carry 10 pounds, stand or walk at least 2 hours in an 8 hour workday, sit about 6 hours in an 8-hour workday, and had unlimited push and/or pull abilities. The doctor noted that the Plaintiff alleged he had multiple sclerosis, irritable bowel syndrome, was hypertensive and had headaches. Dr. Shaikh also determined the Plaintiff would have occasional limitations with climbing, balancing, stooping, etc.. He found no manipulative limitations of reaching overhead

---

[3] The doctor reported a positive MRI of the brain and CSF in November 2001, which revealed positive bands and confirmed multiple sclerosis. [Tr. 172]. Further, that the severity of the findings has remained constant since the onset, with multiple exacerbations.

or gross manipulations in handling items or with fine manipulation. The doctor did note that the Plaintiff's vision was limited - "Claimant can see large print but when fatigued cannot read (sic) sized print". The Plaintiff has environmental limitations regarding machinery, heights, etc., in that the Plaintiff "can avoid normal workplace hazards but when fatigued it is difficult for him to avoid small objects." [Tr. 157-164].

On March 15, 2003, the Plaintiff was admitted to Mt. Clemens General Hospital Emergency Room for heavy drinking and ingestion of Clonazepam pills which he had taken in front of his girlfriend. However, the Plaintiff's alcohol intoxication results were negative. The Plaintiff was discharged to go home with a recommendation for psychiatric hospitalization. Diagnosis was acute/severe major depression, suicidal ideation and drug overdose. (Tr. 211-214).

Between March 26, 2003, and May 29, 2003, the Plaintiff continued to see Dr. Zaki. The Plaintiff was seen for multiple sclerosis, sleep problems, anxiety and depression, stomach cramping and decreased vision. An MRI revealed degenerative disc disease. The Plaintiff continued to be seen for left upper extremity pain, headaches, hearing sensitivity and limited energy. (Tr. 215-250). Impression included multiple sclerosis exacerbation. (Tr. 215).

Between October 21, 2002 and August 22, 2003, the Plaintiff was seen by P. Singaracharlu, M.D., [Tr. 229-234) and it was noted that he had heartburn, multiple sclerosis and was taking Neurontin. (Tr. 229). The Plaintiff was taking Betaseron shots for his multiple sclerosis and had pain all over his body, particularly in his lower back and was using a Duragesic patch. (Tr. 229).

Between October 14, 2002, and October 17, 2003, Plaintiff was seen by Dr. Christina Tervo, for history of multiple sclerosis, urinary tract infection, respiratory infections, reflux disease, headaches, anxiety, back pain and headaches. (Tr. 244-267). The Plaintiff complained of being tired all of the time. Diagnostic testing revealed slight cardiomegaly and radiographic evidence of possible COPD. (Tr. 245).

Between June 2003 and November 3, 2003, the Plaintiff was seen at the Detroit Medical Center Wayne State University Department of Neurology by Dr. John Kamholz. (Tr. 235-243). On June 16, 2003, it was noted that over the prior six months the Plaintiff was experiencing numbness and tingling in his right arm. The MRI was consistent with multiple sclerosis. (Tr. 239-241).

Between February 2, 2004, and April 16, 2004, the Plaintiff returned to the Detroit Medical Center where it was concluded that Plaintiff had definite multiple sclerosis by history, physical exam, MRI scan and CSF analysis. He was placed on Copaxone for long term treatment of his multiple sclerosis. (Tr. 269).

At the hearing held on November 18, 2004, Dr. Newman[4] testified there was nothing in the record to explain the Plaintiff's headaches. Although the Plaintiff has depression, there is no evidence the Plaintiff has a tumor, aneurysm, etc., which might be the etiology of his headaches. The Plaintiff testified to difficulty driving at night, double vision when he was tired and

---

[4] Dr. Steven Newman's appearance was requested as a medical expert by Administrative Law Judge E. Patrick Golden by letter dated 10/6/2004. Dr. Newman was asked to review the medical exhibits in the case. Dr. Newman was asked questions by the ALJ and the Plaintiff's counsel at the hearing.

occasionally seeing spots in his vision. Dr. Newman testified that these visual disturbances are transitory while vision problems related to multiple sclerosis are more prolonged. Dr. Newman testified that the complaint by the Plaintiff of his numerous eye problems are "– that's not characteristic of MS. It may be other problems that he has, but again that would be – and the complaints of Diplopia in the absence of an observable optic – not optic but – a cranial nerve deficit that would not be characteristic of MS. So– and that has never been noted. He simply has not had any really good clinical examination findings demonstrative of MS. The best that's ever been found in the multiple examinations and multiple physicians he's seen and the several neurologists he's seen even right through the present ones, Camhurts [phonetic], the best that anybody has been able to identify is some trouble with tandem walking. That's it".

The Plaintiff's counsel asked Dr. Newman " ..... aren't there MS patients where this profile can I mean – ". ME (Dr. Newman): "Sure". Atty: "Where it's documented on the MRI and you know, it has a positive lumbar puncture test and then they just experience a lot of symptoms?" ME: "sensory symptoms" Atty: "Yeah". ME: "Yeah they can, but usually after this duration of time there is some other heralding of other abnormalities, and that hasn't occurred in this case". Dr. Newman concluded that the vision complaints are also not a component of the Plaintiff's having multiple sclerosis.[Tr. 317].

The Plaintiff's reports of fatigue are also common with multiple sclerosis, but the degree of fatigue is not relative to the MRI findings. Dr. Newman noted that the record contains no substantiation of the Plaintiff's complaints of fatigue other then his own complaints. None of the physicians have documented how fatigue affects the Plaintiff's subjective complaints. Dr. Newman testified that to complete the record " ..... the documentation of what has led to that

conclusion of fatigue just as a patient may come in complaining of depression or complaining of anxiety. We want to know how it's affected them and frequency or duration that would require medication or some other treatment mode, and it doesn't exist. I don't have that in the record. I have an allegation, basically a patient complaint, but there's no other substantiation". [Tr. 321] Dr. Newman further speculated that a neurologist would definitely have consistently documented observations of fatigue in the Plaintiff's medical records.

Once a medically determinable impairment has been established, the intensity and persistence of the symptoms must be evaluated to determine the extent to which the symptoms limit the capacity for work. The evaluation of the intensity and persistence of the alleged symptoms necessitates a determination of the Plaintiff's credibility where the Plaintiff's statements are not substantiated by objective medical evidence. There are seven facts regarding credibility: daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; treatment, other than medication, received for relief of the pain or other symptoms; any measure used by the Plaintiff to relieve the pain or other symptoms; and other factors concerning the Plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3) and 416l.929(c)(3); SSR 96-7p.

Dr. Newman testified that due to the Plaintiff's limited activity for so many years, some of his symptoms may be the result of deconditioning. (Tr. 23). Further, Dr. Newman testified that although the objective evidence does support a diagnosis of multiple sclerosis, and the

consistency of the Plaintiff's complaints suggests credibility, the severity of the disease during this period of time is not supported by the clinical evidence. (Tr. 307-309).

The record shows that until October 2001, the Plaintiff received unemployment benefits. In his application, the Plaintiff alleges he is unable to engage in any work [since January 2001], the date which coincides with when he was laid off from his job. The Appeals Council stated that the filing for and/or receiving of unemployment benefits is not, in itself proof of ability to work. However, filing for and/or receiving benefits in the State of Michigan where the Plaintiff first applied is a representation by an individual that they are able to work. Therefore, the ALJ considered the Plaintiff's disability beginning January 18, 2001, as directed by the Appeals Council but considered his credibility, also, since the Plaintiff's multiple sclerosis diagnosis was not until October 2001 [when he stopped receiving unemployment benefits]. [Tr. 24].

### 1. The ALJ Erred by Failing to Adequately Question the Vocational Expert

The Plaintiff contends that the ALJ erred by failing to adequately question the VE regarding whether the jobs he identified at the hearing were consistent with the Plaintiff's residual functional capacity and conflicted with the Dictionary of Occupational Titles( DOT) as required by Social Security Ruling (SSR) OO-4p. . (Tr. 324-326).

In this case, the VE generally identified jobs during his testimony. (Tr. 324-326). The Plaintiff argues that the VE's testimony conflicts with the information provided in the DOT and thus the ALJ is required to resolve this conflict before relying on the evidence to support a determination or decision that the individual is or is not disabled. SSR 00-4p.

In the instant case, the ALJ specifically asked the VE whether his testimony was consistent with the DOT (Tr. 324). The VE stated, "Your Honor, the DOT classifies the security jobs I mentioned at the light exertional level and at the low end of semi-unskilled. My indication that jobs exist that are sedentary and unskilled is based upon my experience having placed hundreds of workers in those kinds of jobs." (Tr. 324).

The Plaintiff also argues that SSR 00-4p requires the VE to list specific DOT job numbers in order for the ALJ to make a proper consideration of his testimony. (Pl.'s Br. At. 9-11). The DOT, however, is a mere compendium of jobs, and "may not coincide with a specific job as actually performed in a particular establishment or any given industry." Barker v. Shalala, 40 F.3d 789, 795 (6th Cir. 1994) (quoting the DOT), cited in Jones, 190 F.3d at 1230; Donahue v. Barnhart, 279 F.3d 441, 446-47 (7th Cir. 2002).

The evidence of record shows that based on the VE's experience in job placement he appropriately explained the DOT job classifications. Thus, the ALJ made a proper determination and correctly completed the sequential evaluation process. (Tr. 26-27).

### 2.    The Commissioner's Decision was not Supported By Substantial Evidence

The Plaintiff contends that the decision was not supported by substantial evidence because the questions posed by the ALJ to the VE did not incorporate all of the Plaintiff's impairments. (Tr. 324-326). The Plaintiff was born on November 26, 1964, and at the time of his hearing was 40 years old. By applying the regulations, the Plaintiff is considered a "younger individual between the ages of 18 and 44". 20 C.F.R. §§ 404.1563 and 416.96(3). The Plaintiff has a limited education and no transferable skills from any past relevant work.

The ALJ employed a function by function analysis as required by SSR 96-8p and found that physically, the Plaintiff can lift 10 pounds occasionally; sit for eight hours in a work day; stand or walk for a total of six hours in a work day, push or pull without limitation; perform postural activities at least occasionally; perform any manipulative functions; see, hear and speak without limitation; and perform work in any environment not involving machinery with moving parts, heights, fumes and the like, or extreme temperature changes.

The Plaintiff's mental residual capacity assessment was given limited weight by the ALJ as it was made without a personal examination and benefit of the complete record. Further, the ALJ found the Plaintiff can understand, remember and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a route work setting. This places the Plaintiff's residual functional capacity within the range of unskilled sedentary work. If the Plaintiff was capable of performing the full range of sedentary work, a finding of not disabled would be directed by Medical Vocational[5] Rule 201.25. The Plaintiff's ability to perform all or substantially all of the requirements of sedentary work is impeded by additional exertional and/or non-exertional limitations.

---

[5] The Medical Vocational rules are used merely as a framework for the decision when the Plaintiff cannot perform all of the exertional demands of work at a given level of exertion and/or has any non exertional limitations.

The VE indicated that approximately 8,000 job are available in the industrial processing arena and include simple assembly, packaging, visual inspection and sorting. The remaining 1,500 were in the security arena. The DOT classifies these jobs as light and lower-end semi-skilled. The Vocational Expert identified a significant number of jobs in the national economy that Plaintiff could perform. The ALJ applied the correct legal standards in evaluating the Plaintiff's case and substantial evidence supports the ALJ's finding that the Plaintiff could return to other work that exists in the national economy in significant numbers. These jobs can be performed at the sedentary unskilled level. These jobs allow an individual to sit, stand or pace around as needed. These jobs included gate attendant positions and lobby attendants. Since these particular jobs are generally performed after normal working hours, they are also good positions for those having difficulty with the use of their hands. Therefore, the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence. Therefore, It is recommended that a judgment should be entered pursuant to sentence four of 42 U.S.C. §405(g) **AFFIRMING** the decision of the Commissioner.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attaching the factual findings on appeal and a *de novo* determination by a district judge. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *see also* Fed.R.Civ.P. 6; M.D. Fla. R. 4.20.

Case No.  2:05-cv-334-FtM-29DNF

Jamie W. Simpson v. Commissioner of Social Security

**DONE AND ORDERED** in Chambers, Fort Myers, Florida, this 12th day of September, 2006.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Court Requests that the Clerk
Deliver Copies of this Order to:
All Counsel of Record/*Pro Se* Litigants